Inderpal S. SANDHU, Plaintiff,

v.

COMMONWEALTH OF VIRGINIA, DE-
PARTMENT OF CONSERVATION
AND RECREATION, Defendant.

Civ. No. 3:94CV541.

United States District Court,
E.D. Virginia,
Richmond Division.

Jan. 17, 1995.

Inderpal S. Sandhu, pro se.

Pamela Finley Boston, Office of Atty. Gen., Richmond, VA, for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff, appearing *pro se* in this action,[1] alleges that Defendant, in failing to hire him, discriminated against him on account of his national origin in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e *et seq.* ("Title VII"). Defendant has moved for summary judgment, pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. For the reasons which follow, the Court will grant Defendant's motion.

### I.

Defendant Department of Conservation and Recreation, an agency of the Commonwealth of Virginia, is responsible for conservation, recreation, dam safety, floodplain management, and shoreline protection. The agency is divided into four divisions, one of which is the Division of Soil and Water Conservation. Jack Frye is the director of this division. The division consists of several bureaus, including the Bureau of Rivers and Shores (formerly, the Bureau of Flood Protection) which is managed by Louis Button. The Bureau of Rivers and Shores is responsible for dam safety, floodplain management, shoreline programs, public beaches, and district dam consultant programs.

In November, 1992, Button ascertained the need to fill a vacant position in the Division of Soil and Water Conservation. Specifically, Button was looking for an environmental engineer consultant to act as Chief of Dam Safety. Frye approved Button's request to fill the vacancy. This position, listed as "Position # 00721," was advertised in various newspapers and trade publications. The job description, highly detailed and specific, unequivocally stated that applicants must possess managerial, technical and communication skills and experience.[2]

Plaintiff, an Environmental Engineer (Senior) in the Bureau of Rivers and Shores, and sixty-two others applied for Position # 00721. The initial screening process was conducted by Button and Sharon Gay, an architect in the Department of General Services. Using an Applicant Screening/Selection Criteria Review Sheet, Button and Gay selected ten finalists to be interviewed by a three-person panel consisting of Button, Gay and James Cox, manager of the Bureau of Technical Services (formerly, the Bureau of Nonpoint Source Programs). Plaintiff, who is of Indian (Asian) descent, was one of the ten applicants selected for an interview. Three other finalists were either Hispanic or Asian.

---

1. The Court is cognizant that Plaintiff is proceeding *pro se* and will thus adhere to the general principle that courts are required to construe *pro se* complaints liberally when the complaint potentially contains cognizable claims. *Gordon v. Leeke*, 574 F.2d 1147, 1151–52 (4th Cir.) *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978); *Coleman v. Peyton*, 340 F.2d 603, 604 (4th Cir.1965). "Principles requiring generous construction of *pro se* complaints are not, however, without limits." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir.1985).

2. The advertisements were all identical or substantially the same. The advertisement in the *Richmond Times–Dispatch*, for example, read, in part:

    ENVIRONMENTAL ENGINEERING CONSULTANT
    Position # 00721

    Serves as Chief of Dam Safety in DCR's division of Soil & Water Conservation. Manages the Dam Safety section, supervising subordinate engineers. Responsible for staff production and quality control. Develops and publishes internal guidelines for staff guidance. Management and supervisory skills required along with knowledge of dam design and construction. Must be able to communicate effectively in oral and written form, and have demonstrated ability to work with state, local and federal officials and organizations. Graduation from accredited college or university with a major in engineering or demonstrated knowledge, skills and abilities in this field.

    \*　\*　\*　\*　\*　\*

    Affs., Ex. 2M.

Interviews were conducted on March 8, 9 and 12, 1993. Each interviewer followed an Interview Question Worksheet which set forth five job-related questions and a sixth general question.[3] After all the interviews were conducted, the panel members discussed the candidates and reached a consensus that Joseph S. Haugh, a white male then employed as an Environmental Engineer (Senior) with the Bureau of Rivers and Shores, and Myron B. Petrovsky, a white male of Russian descent, were the two top applicants. During the panelists' meeting, Plaintiff was never "discussed as one of the top candidates." Aff. of Button ¶ 28; *see also* Aff. of Gay ¶ 20; Aff. of Cox ¶ 13. Moreover, all three panel members agree that "at no time was national origin discussed during the selection process." Aff. of Button ¶ 28; *see also* Aff. of Cox ¶ 13; Aff. of Gay ¶ 31. Several days later, Haugh received the offer[4] and accepted the position.

Plaintiff, alleging that Defendant, through the interview and selection process for position # 00721, discriminated against him on account of his national origin, filed charges with the Equal Opportunity Employment Commission ("EEOC"). After investigating the charge, the EEOC determined that the evidence did "not support a violation of the statute," and consequently issued a right to sue letter on April 29, 1994. Affs., Ex. 17B. Plaintiff timely filed the instant disparate treatment claim under Title VII.[5] Defendant moved for summary judgment on December 21, 1994.

## II.

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. F.R.Civ.P. 56. Summary judgment is appropriate where parties do not dispute material facts that might affect the outcome of an action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Under Rule 56, the movant bears the burden of proving the absence of any genuine issues of material fact, and the Court must view the facts and any justifiable and legitimate inferences drawn therefrom in the light most favorable to the non-moving party. *Id.* at 248, 255–56, 106 S.Ct. at 2510, 2513–14. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "Genuineness means that the evidence must create fair doubt; wholly

3. The following questions were asked of all interviewees:

(1) Discuss your ability and training in oral and written communications.
(2) Discuss your training and experience in supervision and management.
(3) Discuss your experience and training in working with state, local and federal organizations.
(4) Discuss your training and experience in dam design and construction.
(5) Discuss your P.E. status.
(6) Please discuss other items, not previously covered, that you believe have a bearing on the job.

Affs., Ex. 9A. Each panel member had an interview worksheet listing these questions, and each made notes in the space provided next to each question. *See* Affs., Exs. 10–12.

4. The record reveals that Gay's top choice was actually Petrovsky and that the other panel members did not understand this when the offer was extended to Haugh. This misunderstanding, however, does not bear on the instant matter, given that Haugh and Petrovsky were clearly the top two choices of all the panelists and that Plaintiff was never a top choice for any member of the panel.

5. Plaintiff's complaint properly concerns his rejection for position # 00721. In opposing the summary judgment motion, however, he also cites several other instances of being rejected by Defendant for jobs to which he applied, and suggests that some sort of discriminatory pattern can be inferred from Defendant's general hiring practices. The Court concludes that these other matters, arising in 1988, 1989 and 1990, are not relevant to the instant action, and thus will not be considered. The Court simply will not entertain speculative and conclusory statements concerning alleged illegalities raised in neither the complaint nor the EEOC investigation, especially where the situations cited by Plaintiff fail to demonstrate, in any way, discriminatory intent or actions on Defendant's behalf. The suggestion of any sort of general discrimination in Defendant's hiring procedures is certainly refuted by the fact that three of the six individuals reporting to Button, as of October, 1993, were either Asian or Arabic. *See* Affs., Ex. 21A.

speculative assertions will not suffice." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). Where no genuine issue of material fact exists, the Fourth Circuit has imposed an obligation on the trial judge "to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

Once the movant has met this burden, and a properly supported motion is before the Court, a non-moving party, who will bear the burden of proof at trial on a dispositive issue, may not rest upon mere belief or conjecture, or the allegations and denials contained in his pleadings. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Rather, the non-moving party must set forth specific facts with affidavits, depositions, interrogatories or other evidence to show a genuine issue for trial. *Id.*

Courts must take special care in considering summary judgment in cases involving questions of motive, such as in employment discrimination cases. *Ballinger v. North Carolina Agricultural Extension Service,* 815 F.2d 1001, 1004 (4th Cir.), *cert. denied,* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); *see Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364–65 (4th Cir. 1985). However, " '[t]he fact that motive is often the critical issue in employment discrimination cases does not mean that summary judgment is *never* an appropriate vehicle for resolution.' " *Ballinger,* 815 F.2d at 1005 (*quoting International Woodworkers of America v. Chesapeake Bay Plywood Corp.,* 659 F.2d 1259, 1272 (4th Cir.1981)) (emphasis in original). If the dispute is not material or is not genuine, summary judgment is appropriate.

■ Where a plaintiff is advancing a disparate treatment claim, the Fourth Circuit has adopted the three-part burden of proof test initially set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later clarified in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981). *See e.g., Ross v. Communications Satellite Corp.,* 759 F.2d 355,

365 (4th Cir.1985); *Wheeler v. Travelers Companies,* 866 F.Supp. 268, 270 (E.D.Va. 1994). First, the plaintiff must establish a prima facie case that

1. he is a member of a protected group;

2. he applied for the position in question;

3. he was qualified for the job; and

4. he was rejected in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination.

*Alvarado v. Bd. of Trustees of Montgomery College,* 928 F.2d 118, 121 (4th Cir.1991); *see also McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94. "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094.

■ The burden then falls upon the defendant to rebut this presumption by producing evidence that the plaintiff was not hired for a legitimate, nondiscriminatory reason. *Id.* If the defendant satisfies this burden of production, he has rebutted the presumption raised by the plaintiff's prima facie case. *Id.* at 255, 101 S.Ct. at 1094–95. Because the burden of persuasion remains on the plaintiff, the ultimate burden then falls on him to demonstrate that the reason set forth by the employer "was not the true reason for the employment decision ... either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. The employer's proffered reason is not pretextual "unless it is shown both that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (emphasis added). If the plaintiff fails to evidence a genuine dispute of fact over the employer's nondiscriminatory reason, he has not satisfied his burden and the defendant may prevail as a matter of law. *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1317 (4th Cir.1993).

### III.

■ For purposes of the instant matter, the Court will assume, without deciding, that Plaintiff has set forth a *prima facie* case of disparate treatment. Indeed, this is by no means designed to be an onerous burden. *Burdine*, 450 U.S. at 248, 101 S.Ct. at 1090–91. Thus, a presumption of discrimination exists and the burden of production falls upon Defendant to set forth a legitimate, nondiscriminatory reason for not hiring Plaintiff.

■ Defendant asserts that Plaintiff was not hired because he was not as qualified for the job as was candidate Haugh. The record before the Court confirms that Defendant could have legitimately reached this conclusion. To begin, it is clear that Plaintiff was not even seriously considered for the job upon completion of the interviews, as all the panelists agreed that Haugh and Petrovsky were the top candidates. Moreover, a comparison of Plaintiff's and Haugh's interview worksheets completed by the three panel members confirms and quantifies the nondiscriminatory procedure employed by the panelists in filling the position. Specifically, Gay ranked Haugh "Very Good" as to the content of his responses on four of the six questions (Question #'s 2–5) and "Good" for the remaining two questions (#'s 1, 5). On the other hand, she only ranked the substance of Plaintiff's responses as "Very Good" (#'s 4 & 5), "Good" (#'s 2, 3 & 6) and "Fair" (# 1). Affs. Exs. 10A, 10C.[6] Cox graded the content of Haugh's responses as "Very Good+" on two questions (#'s 1 & 3) and "Very Good" as to the remaining four questions (#'s 2, 4–6). However, he merely graded the substance of Plaintiff's responses as "Very Good" (# 5), "Good+" (# 3), "Fair+" (# 4), "Fair" (#'s 1–2) and "Poor" (# 6). Affs. Exs. 11B, 11G. Finally, Button, while rating the substance of Haul's responses to five questions as "Very Good" (#'s 1, 3–6) and to the remaining question as "Good" (# 2), rated the content of Plaintiff's response to one question as "Very Good" (# 5), to two questions as "good" (#'s 3 & 4) and to three questions as "Fair" (#'s 1, 2 & 6).

Affs., Exs. 12A, 12G. Thus, the panel was unanimous in giving Haugh higher scores when compared to Plaintiff.

The record makes it abundantly clear why the panelists were more impressed with Haugh than they were with Plaintiff. Specifically making an impact on the panelists during the interview was Haugh's (1) lengthy and diverse experience with the Soil Conservation Service of the United States Department of Agriculture, including his role as the primary developer and writer of SCS's dam safety plan; (2) impressive list of technical publications; (3) extensive interaction with and testimony before Congressional committees; (4) outstanding interpersonal skills; (5) prior supervision of planners and technical staff; and (6) lengthy and thoughtful response to question six in which he stated his philosophy on dam safety and management and the need to foster public relations. *See* Affs. of Button, Gay, Cox and Haugh; Affs. Exs. 10–12.

The record is equally clear that the interviewers were not as impressed with Plaintiff's presentation. For example, they all expressed concern about Plaintiff's communication skills, both written and oral. First, any writing experience revealed by Plaintiff paled in comparison to that of Haugh. As regards oral communication skills, it is apparent that any concern in this regard did not necessarily refer to Plaintiff's accent, his mastery over the English language or where he was schooled, but, rather, to an apparent deficiency in general interpersonal skills, which were clearly required of applicants. Affs. of Gay, Button and Cox. The panelists were also troubled by the fact that Plaintiff's management experience seemed inapplicable to Position # 00721 and was not recent enough to be satisfactory. Aff. of Button ¶ 46; Cox ¶ 23. Finally, the panelists, in general, were not as impressed with Plaintiff's response to the open-ended question number six. In contrast to Haugh's thoughtful exposition of the position, Plaintiff only stated his readiness for the job, discussed several presentations that he had made in the past, and noted his role in drafting the

---

**6.** Interestingly, Plaintiff does not consider any of Gay's actions during the interview or her written comments to be discriminatory. Dep. of Plaintiff at 29, 40.

Bureau's internal guidelines.[7] In short, the panelists determined that Plaintiff's overall presentation and application package was subordinate to those of Haugh.

Defendant has submitted other evidence tending to show that its failure to hire Plaintiff was nondiscriminatory. For example, statistical evidence submitted by Defendant plainly indicates that the Bureau of Rivers and Shores has actively recruited and hired individuals of non-American descent. Specifically, a Department of Conservation Roster, dated October 1, 1993, indicates that of the six individuals reporting to Button as of that date, two were Asian and one was Arabic. Affs., Ex. 21A; *see also* Aff. of Button ¶ 51.

■ On this record, the Court concludes that Defendant's decision that Haugh was the more qualified applicant was fully justified and non-discriminatory. Selection of a more highly qualified applicant is a non-discriminatory reason for rejecting another applicant. *Love v. Alamance County School Bd.*, 757 F.2d 1504, 1507 (4th Cir.1985). Thus, Defendant has rebutted any inference of discrimination, and the burden rests upon the Plaintiff to point to disputed facts that create a legitimate and justifiable inference that Defendant's reasons were, in fact, nothing more than a pretext for discrimination.

■ Plaintiff fails to carry this burden as his claim is supported by little or no factual basis. In fact, Plaintiff admitted at his deposition that the questions and the interview format itself were not discriminatory. Dep. of Plaintiff at 20–23, 40. Plaintiff, instead, attempts to argue that Button and Cox evidenced discriminatory intent in their written interview comments, particularly their commentary regarding the content of Plaintiff's response to the communication skills question.[8] This claim is meritless. To begin, the comments, on their face, lack any indicia of discrimination. Moreover, Plaintiff seems to lose sight of the fact that the term "communication skills" does not simply mean the ability to speak unfettered English; rather, the phrase denotes the ability to relate effectively to subordinates, superiors and third persons encountered in the job place. The panelists were plainly troubled, for various reasons, with Plaintiff's ability to so relate and graded Plaintiff accordingly.

Plaintiff also suggests that discrimination can be inferred from the fact that his score on the Applicant Screening/Selection Criteria & Review Sheet does not correspond with the written comments contained in the interview worksheets. *Compare* Plaintiff's Exs. C & D (initial applicant review sheet scores) *with* Affs., Exs. 10C, 11G, 12G (interview worksheet results). While it is true that Plaintiff was one of the top ranked candidates after the initial screening process, it is also true that the hiring decision did not occur until all finalists had been interviewed. An initial resume screen is inherently different from interview commentary from which the ultimate hiring decision is made. *Cf. Page v. Bolger*, 645 F.2d 227, 233 (4th Cir.), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981) (differentiating "mediate decisions" in the selection process from the

---

7. Button indicated that Plaintiff exaggerated his role in drafting the Bureau's guidelines. Aff. of Button ¶ 49.

8. The communication question was the first question presented to all interviewees. *See supra* note 3 (setting forth interview questions). Specifically, Button's commentary on the substance of Plaintiff's response to Question # 1 was: "Very technical/Ph.D./English precise & grammatically correct/Difficult to understand/Aura of superiority." Affs., Ex. 12G. Button states that the comment, "Difficult to understand," reflected his concern that Plaintiff may speak too rapidly. Aff. of Button ¶ 45.

On the same question, Cox wrote: "All schooling & training done in English/Listed Training &

Schooling." Affs., Ex. 11G. Plaintiff admits that Cox' written statements correctly reflect his response to Question # 1. Dep. of Plaintiff at 38. When asked how the comment was therefore discriminatory, Plaintiff stated that the comment, in conjunction with Cox' grade of "Fair," reflected the fact that Plaintiff speaks with an accent and that Cox consequently based his grade on this purported accent. *Id.* at 38–39. Plaintiff's suggestion, however, is nothing more that pure speculation. Indeed, there is absolutely no factual support for the proposition Cox was troubled by Plaintiff's alleged accent.

In addition, the Court notes that a review of Cox' and Button's written critiques of Plaintiff's responses to the remaining five questions likewise reveals a complete absence of any discrimination.

ultimate employment decision). The former step of the process merely "gets someone in the door." On the other hand, the personal interview is often the determinative factor in many hiring decisions. Only during an interview can one's demeanor and personality be evaluated in light of the position sought to be filled. Many an interviewer will surely attest that an applicant impressive on paper is not necessarily impressive in person. On this basis, the Court concludes that this fact is insufficient to sustain any inference whatsoever that the Haugh was not, as Defendant argues, the better qualified applicant.

Whittling away Plaintiff's various conclusory statements reveals that he is merely suggesting that he, and not Haugh, was the more highly qualified applicant. *See* Complaint ¶¶ 11–12. "[His] perception of himself, however, is not relevant. It is the perception of the decision maker which is relevant." *Smith v. Flax,* 618 F.2d 1062 (4th Cir.1980). It is manifest that Defendant found an individual who was considered to be a better qualified applicant, and that Plaintiff has wholly failed to set forth any facts permitting an inference that Defendant's conclusion in this regard is false, and that discrimination was the real reason for Defendant's action. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2742 (1993). In fact, there is not even a scintilla of evidence of discrimination anywhere in the record. On this basis the Court concludes that Plaintiff has failed to satisfy his burden of persuasion as a matter of law. *Mitchell,* 12 F.3d at 1317. Accordingly, the Court will grant Defendant's motion for summary judgment.